UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **VERSUS** | **NO: 21-179** |
| **PETER J. JENEVEIN** | **SECTION "H"** |

### ORDER AND REASONS

Before the Court is Defendant Peter Jenevein's Rule 29 Motion for Judgment of Acquittal (Doc. 185). Oral argument was held on July 19, 2023. For the following reasons, the Motion is **DENIED**.

### BACKGROUND

In November 2022, Defendants Glenn Diaz, Peter Jenevein, and Mark Grelle were charged in a 31-count Superseding Indictment with conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 1344(2) and 1349; conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h); and bank fraud in violation of 18 U.S.C. § 1344(2).[1] After a seven-day jury trial, Defendant Jenevein was found guilty on all 31 counts. Jenevein now moves for judgment of acquittal on all counts.

---

[1] *See* Doc. 98. Diaz and Jenevein were charged in each of the 31 counts of the Superseding Indictment, and Grelle was charged in 20 of the counts. Count 1 charged all three Defendants with conspiracy to commit bank fraud. Count 2 charged all three Defendants with conspiring to commit money laundering. In Counts 3 through 31, Diaz and Jenevein were charged with bank fraud, and Grelle was also charged in Counts 3 to 6, 11, 14, 15, 18 to 25, and 28 to 30.

1

The evidence presented at trial revealed the following. Glenn Diaz was a customer of First NBC Bank ("FNBC" or "the Bank"), a federally insured financial institution, from approximately 2006 until its closure in 2017. Pete Jenevein was personal friend and employee of Diaz. Mark Grelle was also a friend of Diaz and owned St. Bernard Underground Services, a business that performed directional boring services.

Despite being asset-rich, Diaz claimed to be cash-poor, and managed many of his personal and business expenditures by overdrafting his FNBC checking account. By 2015, Diaz had overdrafted his account by almost one million dollars; these overdrafts were approved by FNBC president Ashton Ryan. Because Diaz's overdrafts were often checks issued to himself, which he deposited in his Trustmark Bank account, FNBC had no visibility into the sources of the expenses. As a result, by June 2016, Ashton Ryan and Loan Officer Bill Bennet informed Diaz that, in order to monitor how Diaz was spending its funds, all checks were required to be supported by itemized expenses for a Florida warehouse, Diaz's property that served as the Bank's collateral.[2] FNBC also required Diaz to issue all checks to the end recipient, and not to Diaz himself.[3]

---

[2] On June 7, 2016, Bennett instructed Diaz and Jenevein that "there are no other funds available for further checks," and asked them to "[p]lease stop writing checks on the First NBC account." Government Ex. 25. Bennett also explained that "[i]n order to move forward, I need more information from you," and delineated the requirements that had to be satisfied before the Bank would fund future overdrafts and loans, including a "detailed breakdown of expenses you project in order to make the Florida property ready for the new tenant." *Id*. On June 13, 2016, Bennett emailed Diaz, writing "I told you the bank could only consider paying checks if we had invoices to support them. We had $28k in invoices, and Ashton covered $28k in checks. I continued telling you we needed invoices to pay checks." Government Ex. 36.

[3] On June 13, 2016, Ashton Ryan emailed Diaz, stating "The checks have to be to the end recipient. No more checks to yourself." *Id*. The following day, Diaz forwarded Ryan's email to Jenevein, instructing him to "[n]ever write a check to my name any more[.] Only to the end user or recipient." *Id*.

Because Jenevein was responsible for managing Diaz's properties, including the Florida warehouse, through the rest of 2016, Jenevein emailed invoices and lists of expenses to Bennett, copying Diaz.[4] Based on these representations, the Bank permitted Diaz to overdraft his account, which Bennett explained was tantamount to an unsecured loan.[5] Loans were subsequently made by the Bank to cover the overdrafts "created by repairs to [Diaz's] warehouse in Lynn Haven, FL."[6] At trial, the evidence revealed that Diaz did not actually spend the Bank's money on his Florida warehouse, as he represented. Rather, Diaz was able to obtain these funds through a scheme that involved submitting fabricated invoices and financial documents to the Bank with the help of Jenevein and Grelle.

The scheme essentially involved two parts. First, Jenevein and Grelle fabricated invoices that falsely represented that Grelle Underground Services LLC, a company owned by Grelle, performed services at Diaz's Florida warehouse. Jenevein then emailed the fake invoices to Bennet, copying Diaz. Based on these invoices, the Bank distributed the funds to Grelle, who ultimately funneled the money back to Diaz while keeping a portion for himself. These circular transactions occurred a total of 17 times and formed the basis for 17 counts of bank fraud, as well as conspiracy to commit bank fraud and conspiracy to commit money laundering.

The second part of the scheme also involved submitting false information to the Bank. Instead of circular transactions conducted with Grelle Underground Services, Jenevein sent the Bank fake invoices from other companies, payroll for purported Diaz employees, and bogus credit card itemizations. Based on these representations, the Bank distributed the funds.

---

[4] *See* Government Exs. 22, 23.
[5] *See* Government Ex. 24.
[6] Government Ex. 78. *See also* Government Exs. 1001–05.

The costs reflected in these documents, however, were inflated, not incurred, or for other expenses unrelated to maintaining Diaz's Florida warehouse.

## LEGAL STANDARD

Under Rule 29 of the Federal Rules of Criminal Procedure, a defendant may move for a "judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."[7] "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[8] To this end, the court must "review the evidence and the reasonable inferences which flow therefrom in the light most favorable to the verdict."[9] The court is "concerned only with whether the jury made a rational decision, not whether its verdict was correct on the issue of guilt or innocence."[10]

## LAW & ANALYSIS

**A. Conspiracy to Commit Bank Fraud and Bank Fraud**

Count 1 of the Superseding Indictment charged Defendants with conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 1344(2) and 1349. Counts 3 through 31 of the Superseding Indictment charged Defendants with bank fraud in violation of 18 U.S.C. § 1344(2). As to bank fraud conspiracy, the Government was required to prove beyond a reasonable doubt that: (1) "the defendant and at least one other person agreed to commit the crime of [bank fraud]"; and (2) "the defendant knew the unlawful purpose of the agreement

---

[7] FED. R. CRIM. P. 29.
[8] Jackson v. Virginia, 443 U.S. 307, 319 (1979).
[9] United States v. Ramos-Cardenas, 524 F.3d 600, 605 (5th Cir. 2008) (internal quotations omitted).
[10] *Id.* (internal quotations omitted).

4

and joined in it willfully, that is, with the intent to further the unlawful purpose."[11] To secure a conviction on bank fraud, the Government was required to prove that: (1) "the defendant knowingly executed a scheme or artifice"; (2) "the scheme or artifice was executed to obtain money or other property from a financial institution"; (3) "the scheme or artifice was executed by means of false or fraudulent pretenses, representations, or promises"; and (4) "the false or fraudulent pretenses, representations, or promises were material."[12]

The jury found Jenevein guilty of conspiracy to commit bank fraud and 29 counts of bank fraud, and its conviction is adequately supported by the record. At trial, the Government presented evidence that the Defendants acted in concert to submit fabricated invoices and credit card itemizations on behalf of Diaz to FNBC. These documents were submitted as "proof" of expenses incurred in improving Diaz's Florida warehouse, a property that served as the Bank's collateral. Based on these misrepresentations, the Bank authorized Diaz to issue checks that overdrew his account.

Jenevein argues that the Government failed to prove the fourth element of bank fraud—that any false representations were material. According to Jenevein, FNBC banker Bill Bennett testified that he lacked the authority to approve or deny Diaz's loan requests and that this authority rested solely with former FNBC president Ashton Ryan, who did not testify at trial. Without Ryan's testimony, Jenevein argues that the Government failed to prove whether FNBC relied on any of his representations. Jenevein further contends that any misrepresentations could not have been material because FNBC

---

[11] Pattern Crim. Jury Instr. 5th Cir. 2.15A (2019). *See also* United States v. Pascacio-Rodriguez, 749 F.3d 353, 363-64 (5th Cir. 2014) (stating that, unlike conspiracy under 18 U.S.C. § 371, fraud conspiracy under § 1349 does not require an overt act).
[12] Pattern Crim. Jury Instr. 5th Cir. 2.58B (2019).

demonstrated that it did not care how Diaz spent the money. The Court disagrees.

Jenevein's argument misapprehends the standard of materiality. "In general, a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed."[13] "This definition, in referring to natural tendencies and capabilities, establishes materiality in the bank fraud context as an objective quality, unconcerned with the subjective effect that a defendant's representations actually had upon the bank's decision."[14] As a result, "there is no requirement that the misrepresentations must have actually influenced the decision-maker or that the decision-maker in fact relied on the misrepresentations."[15] Thus, the Government was not required to prove that FNBC actually relied on Defendants' representations.

Even so, former FNBC employees Bill Bennett and Robert Stone testified that the Bank was especially attentive to how Diaz was spending its proceeds in 2016. For instance, a June 2016 email from Bennett to Diaz and Jenevein instructed that additional checks could only be written for Florida warehouse repairs and that the bank would require "[a] detailed breakdown of expenses you project in order to make the Florida property ready for the new tenant."[16] Accordingly, it cannot be said that no rational jury would have found that Defendants' misrepresentations tended to influence or were capable of

---

[13] Neder v. United States, 527 U.S. 1, 16 (1999) (quotation and alteration omitted).
[14] United States v. Irvin, 682 F.3d 1254, 1267 (10th Cir. 2012). *See also* United States v. Wolf, 860 F.3d 175, 193 (4th Cir. 2017) (explaining that "the test for whether a false statement to a bank is material is an objective one; it does not change from bank to bank").
[15] United States v. O'Brien, 953 F.3d 449, 460 (7th Cir. 2020). *See also* United States v. Gregg, 179 F.3d 1312, 1315 (11th Cir. 1999) (stating that "reliance is not necessary to make the false statement material").
[16] Government Ex. 25.

influencing FNBC. Defendant Jenevein's request for acquittal on these counts is denied.

## B. Conspiracy to Commit Money Laundering

Count 2 charged Defendants with conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h). Here, the government was required to prove beyond a reasonable doubt: "(i) 'that there was an agreement between two or more persons to commit money laundering'; and (ii) 'that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose.'"[17] The object of the conspiracy charged in this case was concealment of the proceeds of bank fraud,[18] which required the Government to prove that: (1) "the defendant knowingly conducted [or] attempted to conduct a financial transaction" involving "the proceeds of a specified unlawful activity, namely [bank fraud]"; (2) "the defendant knew that the property involved in the financial transaction represented the proceeds of" bank fraud; and (3) "the defendant knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the specified unlawful activity."[19]

Jenevein argues that he should be acquitted of conspiracy to commit money laundering for two reasons. First, he argues that the Government failed to prove the materiality element of bank fraud. Consequently, he contends that the Government failed to prove an essential element of a money laundering conspiracy, i.e., the existence of proceeds of an unlawful specified activity. This

---

[17] United States v. Alaniz, 726 F.3d 586, 601 (5th Cir. 2013) (quoting United States v. Fuchs, 467 F.3d 889, 906 (5th Cir. 2006)).
[18] *See* 18 U.S.C. § 1956(a)(1)(B)(i).
[19] Pattern Crim. Jury Instr. 5th Cir. 2.76A (2019). Bank fraud is a specified unlawful activity. *See* 18 U.S.C. § 1956(c)(7) (referencing 18 U.S.C. § 1961(1)); 18 U.S.C. § 1961(1) (listing 18 U.S.C. § 1344 as an enumerated offense)).

7

argument is unavailing, as the Court has previously determined that the Government presented sufficient evidence for a rational jury to convict Jenevein of bank fraud.

Next, Jenevein maintains that the Government failed to prove that he entered into any conspiratorial agreement or otherwise conducted any financial transactions designed to conceal bank fraud. Not so. At trial, the evidence revealed that by June 2016, FNBC required all checks to be justified by invoices for the Florida warehouse and to be written to the end recipient.[20] The evidence further established that each Defendant had a unique role in conducting circular financial transactions to avoid scrutiny by FNBC. Jenevein's role involved creating and submitting false invoices to FNBC for services purportedly, though not actually, performed by "Grelle Underground Services." Based on these falsities, FNBC permitted Diaz to write checks to Grelle, who then deposited them in his Regions bank account. The evidence showed, however, that Grelle ultimately returned the funds to Diaz to be deposited in Diaz's Chase bank account.

On July 27, 2016, for example, Jenevein emailed Grelle with the subject line "Invoice ceiling tiles an[d] insulation," giving him the date (July 12, 2016), amount ("Total $18,933.00"), and contents (such as "30 Rolls of hanging wire" and "Payment upon delivery") for the invoice.[21] Jenevein subsequently emailed the completed "Grelle Services" invoice to Bennett, copying Diaz and writing, "This invoice was paid today with a first nbc check. This invoice is associated

---

[20] On June 13, 2016, Bill Bennett emailed Diaz, writing "I told you the bank could only consider paying checks if we had invoices to support them. We had $28k in invoices, and Ashton covered $28k in checks. I continued telling you we needed invoices to pay checks." Government Ex. 36. That same day, Ashton Ryan emailed Diaz, stating "The checks have to be to the end recipient. No more checks to yourself." *Id.* The following day, Diaz forwarded Ryan's email to Jenevein, instructing him to "[n]ever write a check to my name any more[.] Only to the end user or recipient." *Id.*

[21] Government Ex. 494.

with The ceiling, insulation, tracts, wire etc for metal pro warehouse office."[22] Grelle then deposited a check written from Diaz's FNBC account for $18,933.00 on July 28, 2023.[23] On August 9, 2016, Grelle issued a check from his Regions account back to Diaz for $18,000, which Diaz then deposited into his personal Chase checking account.[24] These circular financial transactions occurred a total of 17 times.[25]

These circular transactions establish the requisite elements of a conspiracy to commit money laundering.[26] Although there was no direct evidence of an explicit agreement to launder money, a rational jury could infer the existence of a tacit understanding from the concerted actions of the Defendants.[27] The Government was not required "to prove that the alleged conspirators entered into any formal agreement, or that they directly stated between themselves all the details of the scheme."[28] Likewise, the Government was not required "to prove that all of the details of the scheme alleged in the indictment were actually agreed upon or carried out."[29] Rather, such concert of action is sufficient to prove conspiracy to commit money laundering.[30]

Finally, the Government was not required to prove that each Defendant personally conducted or attempted to conduct the financial transactions at issue because "each member of the conspiracy becomes the agent of every other

---

[22] Government Exs. 074, 074A.
[23] Government Exs. 076, 334.
[24] Government Exs. 333, 1023.
[25] *See* Government Ex. 1008.
[26] *See* 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h).
[27] *See* United States v. Davis, 1998 WL 514156, at *3 (2d Cir. July 8, 1998) (citing United States v. Desimone, 119 F.3d 217, 223 (2d Cir. 1997) (stating that a "conspiratorial agreement itself may be established by proof of a tacit understanding among the participants, rather than by proof of an explicit agreement")).
[28] Pattern Crim. Jury Instr. 5th Cir. 2.15A (2019).
[29] *Id.*
[30] *See Davis*, 1998 WL 514156 at *3.

member."[31] As the Government notes, a rational jury could infer that Jenevein's role—knowingly making false statements to induce FNBC's relinquishment of funds—was critical to the conspiracy's success because he oversaw Diaz's properties and was therefore the conspirator best suited to submit false invoices on Diaz's behalf. Defendant Jenevein's request for acquittal on this count is also denied.

## CONCLUSION

For the foregoing reasons, Defendant Peter Jenevein's Rule 29 Motion for Judgment of Acquittal (Doc. 185) is **DENIED**.

New Orleans, Louisiana, this 31st day of August, 2023.

**HON. JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

---

[31] Pattern Crim. Jury Instr. 5th Cir. 2.15A (2019). *See also* United States v. Delgado, 256 F.3d 264, 275–76 (5th Cir. 2001) (noting that the element can be proven even if the defendant has not personally handled the funds in question).